## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>    v.<br><br>JOVAN ANDRE HILL,<br><br>       *Defendant.* | Criminal Action No. 19-331 (RDM) |

## <u>MEMORANDUM OPINION AND ORDER</u>

On September 28, 2019, law enforcement officers executed a search warrant at an apartment located at 3513 Ames Street, N.E., on suspicion that the apartment contained illegal narcotics and illegal firearms. Officers had obtained the warrant the day before, after attesting to a D.C. Superior Court judge that a reliable confidential informant had made a controlled buy of narcotics at the apartment within the past 72 hours. During their search, officers discovered a loaded and unregistered pistol in Defendant Jovan Andre Hill's vicinity and cocaine on his person. Hill was arrested at the scene and was later questioned by detectives at the police station, during which he made inculpatory statements. Shortly thereafter, a grand jury indicted Hill with one count of unlawful possession of a firearm by a person previously convicted of a felony, in violation of 18 U.S.C. § 922(g)(1), and one count of possession of a controlled substance, in violation of 21 U.S.C. § 844(a). Dkt. 6.

This matter is before the Court on Hill's motion to suppress (1) the physical evidence officers uncovered during the search of the apartment and (2) the statements Hill made during his interrogation by police. Dkt. 34. For the reasons set forth below, the Court will **GRANT** in part and **DENY** in part Hill's motion.

## I. BACKGROUND

On September 27, 2019, officers from the Metropolitan Police Department ("MPD")

applied for a warrant to search 3513 Ames Street, N.E., Apt. 102, Washington, D.C., for

evidence of gun and drug offenses.  *See* Dkt. 35-1 (Ex. A) (signed warrant and accompanying

affidavit).  The affidavit supporting the warrant attested that, as part of an operation to buy

narcotics from "known drug trafficking locations," officers had used a reliable confidential

informant to make a controlled buy at the apartment within the previous 72 hours.  Dkt. 35-1 at

4–5 (Ex. A at 2–3).  The affidavit explained that the confidential informant had "worked with the

[MPD] for over ten years," had "participated in at least twenty-five controlled purchases of

illegal controlled substance[s]," had "provided information to members of law enforcement that

. . . resulted in at least eleven search warrants being obtained," and had "never provided

information to a member of Law Enforcement that . . . was later determined to be unreliable."

*Id.* at 4 (Ex. A at 2).  It further explained that, before the controlled buy, an undercover officer

"met with [the informant], at which time, [the informant] was searched[,] . . . found to be free of

any and all narcotics, as well as monies[,] [and] was provided MPDC funds in order to make the

. . . controlled purchase.  Surveillance of [the informant] was then conducted as [the informant]

responded to the location known as 3513 Ames St. NE, Washington, DC  20019."  *Id.* at 5 (Ex.

A at 3).  The confidential informant reported that, once inside, he or she "utilized the MPDC

funds to purchase a zip containing a powdery substance from a black male inside of the location.

Once the transaction was complete, [the informant] left the location and was again surveilled as

[the informant] responded back to undercover officers . . . [and] handed [them] the zip containing

the powdery substance."  *Id.*  According to the affidavit, a field test of the powdery substance

"yielded a positive color reaction presumptive for the presence of Opiates."  *Id.*  Based on this

investigation, the affidavit averred that there was probable cause to search the apartment for illegal narcotics and "paraphernalia," *id.*, and that, because "persons who possess and traffic narcotics . . . keep[,] possess, and own firearms for protection, and firearm components, accessories, [and] ammunition," *id.* at 4 (Ex. A at 2), there was also probable cause to search the apartment for those materials as well, *id.* at 5 (Ex. A at 3).

Relying on the affidavit, a D.C. Superior Court judge issued a warrant to search the apartment for "narcotics and narcotics related materials" as well as "firearms, firearms receipts, ammunition, holsters, firearms cleaning equipment, [and] magazines." Dkt. 35-1 at 2. Police executed the warrant the following morning, on September 28, 2019. Dkt. 35 at 2; Dkt. 35-2 at 2. When the officers entered, Hill was in the living room and another person was in the bedroom. Dkt. 35 at 2. According to the government, officers found a "loaded and unregistered pistol" in a "couch in the living room," which later testing revealed to contain Hill's DNA, and they also found a "white rock substance" in the bedroom that tested positive for cocaine. *Id.*

Hill was placed under arrest and taken back to the station. Dkt. 34 at 2. When officers searched him there, they found "three yellow zips of white rock . . . in his shoe" which also "tested positive for cocaine." Dkt. 35 at 2. Two detectives sought to interview Hill at the station. *Id.* They advised him of his *Miranda* rights, *id.* at 2–3, and then asked Hill whether he "wish[ed] to answer any questions," to which Hill responded, "No, not really, no," *id.* at 3. The detectives followed up by asking, "Are you willing to answer any questions without an attorney present?" Hill replied: "I'd rather have an attorney present. I need to know what I'm locked up for." *Id.* Instead of stopping the interview at this point, the detectives continued to ask questions, and the following exchange ensued:

> Detective:    You don't want to talk to us about what happened? That's, that's it, right? You don't want, you don't have to, it's your right, man.

| | |
|---|---|
| Hill: | What happened as far as what? |
| Detective: | Today, why you're here. |
| Hill: | Oh yeah, I mean, I mean . . . |
| Detective: | Here's the thing, man, I'm sure you have questions for us. |
| Hill: | I know why I'm here, far as the gun, you know what I'm saying, that they found in the apartment, that's about it. |
| Detective: | Listen, um, we . . . we, um, want to fill in all the pieces of what happened.  I'm sure you have questions for us, we have questions for you.  We can't ask you questions about what you're locked up for unless you want to talk to us you know after we've, after he's read your rights.  If you don't want to talk, you don't have to, man.  That's your right, man.  That's your call.  The thing is this, as far as your questioning.  If you do, if you did want to talk to us and we ask you questions, you can stop at any time you want.  We can ask you questions, you say OK to this, OK to that, and if we ask you a question you don't like or don't want to go down that path, you have the right to immediately stop and say, "I'm done."  Like, you're in total control. |
| Hill: | OK, yeah. |
| Detective: | But it, but it's completely up to you, man.  You have to decide. |
| Hill: | Alright, we can, we can, we can, we can go that route, we can go that route right there.  Cuz I most definitely just . . . know, you know what I'm saying, what I'm locked up for, period. |

Dkt. 35 at 3–4.  The detectives then reread Hill his *Miranda* rights, *id.* at 4, after which Hill

signed a waiver-of-rights form, *see* Dkt. 35-4 (Ex. D).  During the interview that followed, Hill

admitted that the pistol officers had seized belonged to him.  *Id.*

On October 1, 2019, a grand jury indicted Hill for unlawful possession of a firearm by a

person previously convicted of a felony, in violation of 18 U.S.C. § 922(g)(1), and possession of

the crack cocaine in his shoe, in violation of 21 U.S.C. § 844(a).  Dkt. 6.  On April 19, 2020, Hill

filed a motion to suppress the physical evidence found during the officers' search and his

4

statement to the detectives.  Dkt. 34.  The government filed its memorandum in opposition on April 28, 2020, Dkt. 35, and Hill filed his reply on May 20, 2020, Dkt. 37.  On November 29, 2021, the Court held an evidentiary hearing, at which it heard testimony from one of the two detectives who questioned Hill and heard argument from counsel.  *See* Min. Entry (Nov. 29, 2021).  At the same hearing, the parties also proffered documentary evidence and a video recording of Hill's interrogation by police.  *See id.*

## II.  ANALYSIS

Hill's motion to suppress raises two issues: first, that the search of his apartment, which turned up a loaded pistol and cocaine, violated Hill's rights under the Fourth Amendment because it was not supported by probable cause, and, second, that the detectives who questioned Hill did not honor his unambiguous request for counsel, thereby rendering his interview and confession unlawful.  After considering the parties' arguments as well as the record evidence, the Court concludes that the search of Hill's apartment was supported by probable cause and, in any event, that the officers had reasonably relied upon the search warrant issued by the D.C. Superior Court judge.  Accordingly, the Court will deny Hill's motion with respect to the physical evidence uncovered during the search of his apartment.  The Court is persuaded, however, that Hill unequivocally invoked his Fifth Amendment right to counsel and, thus, his subsequent interrogation occurred in violation of his *Miranda* rights.  The Court will therefore grant Hill's motion with respect to his invocation of counsel and will suppress evidence of Hill's post-invocation statement to police.

A.    **Physical Evidence Acquired During the Search of Hill's Apartment**

    1.    *Probable Cause*

The Fourth Amendment protects against "unreasonable searches and seizures" and, to that end, provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place or places to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In general, evidence acquired in violation of the Fourth Amendment must be excluded unless "Fourth Amendment interests will [not] be advanced" by the application of the exclusionary rule. *United States v. Leon*, 468 U.S. 897, 915–16 (1984).

Hill faces an uphill battle to show that the search of his apartment, which occurred pursuant to a search warrant issued by a D.C. Superior Court judge, violated the Fourth Amendment. When a magistrate is presented with an application for a warrant, his task is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The role of a reviewing court, in turn, "is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Id.* at 238–39 (alteration in original) (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960), *overruled on other grounds by United States v. Salvucci*, 448 U.S. 83 (1980)). As the Supreme Court has repeatedly admonished, an issuing magistrate's probable cause determination is entitled to "great deference." *Leon*, 468 U.S. at 914 (quotation marks omitted); *accord Gates*, 462 U.S. at 236; *Spinelli v. United States*, 393 U.S. 410, 419 (1969).

In his motion to suppress, Hill asserts that the Superior Court judge lacked probable cause to issue the warrant because the only basis for the search was "a single controlled purchase of narcotics" that resulted from "information provided by [a] confidential informant" for which there was "no corroboration." Dkt. 34 at 4. Hill faults the affidavit for not describing "any further police investigation" of Hill's apartment, such as "observation of deliveries to the address, . . . monitoring of the frequency or volume of visitors to the house, [a] second controlled buy, [or any] further surveillance." *Id.* (quoting *United States v. Hython*, 443 F.3d 480, 486 (6th Cir. 2006)). Although Hill admits that the affidavit contained "statements regarding the informant['']s past cooperation," he argues that those statements do "not suffice" because they are "conclusory." *Id.* (citing *Wilhelm*, 80 F.3d 116, 120 (4th Cir. 1996)). He also insists that the affidavit could not have provided a basis for probable cause because it never explained how the officers initially concluded that Hill's apartment was a "known drug trafficking location," Dkt. 35-1 at 4 (Ex. A at 2), that should be the target of a controlled buy. Dkt. 37 at 5. Hill observes that "[t]he affidavit . . . lack[ed] any information that . . . the informant had prior knowledge of drug sales in the home." *Id.* According to Hill, one controlled buy, standing alone, does not "dispel[] the [possibility] that the sale was a one-time incident," and a one-time incident, he argues, would not have provided a foundation for probable cause that ongoing drug activity was occurring on the premises. *Id.*

For its part, the government maintains that the D.C. Superior Court judge "reasonably issued [the] warrant." Dkt. 35 at 7. It points out that the supporting affidavit explained in detail how officers "had been 'deploying confidential informants in an attempt to purchase narcotics from known trafficking locations'" and "had arranged a specific controlled buy at this particular apartment within the previous 72 hours;" that, "[d]uring the operation, officers checked the

confidential informant to make sure he or she was 'free of any and all narcotics' before making the purchase;" that the officers "surveilled the informant going to and from the apartment building;" and that the "informant came back with a zip containing a white powdery substance that tested positive for opiates." *Id.* (quoting Dkt. 35-1 at 4–5 (Ex. A at 2–3)). According to the government, this kind of fact pattern is enough to support probable cause. *Id.* at 8. For support, it points to *United States v. Warren*, in which the D.C. Circuit explained that "police establish probable cause for a search where they corroborate a reliable informant's tip about drug activity at a residence by conducting a single controlled buy of illegal narcotics," 42 F.3d 647, 652 (D.C. Cir. 1994); and *United States v. Parker*, in which this Court held that "a single purchase by a confidential informant within 72 hours of the issuance of the warrant . . . furnish[ed] the [j]udge with a sufficient basis for [a] probable cause determination," 789 F. Supp. 27, 30 (D.D.C. 1992).

The government also argues that the Sixth Circuit and Fourth Circuit cases that Hill relies upon are easily distinguishable. It contends that the Sixth Circuit's decision in *Hython* is inapplicable because the affidavit in that case "'offer[ed] no clue' as to" when "the [controlled] buy had occurred," and so "there was 'absolutely no way' to determine whether probable cause continued to exist at the time the warrant was requested," Dkt. 35 at 8 (first alteration in original) (quoting *Hython*, 443 F.3d at 486), whereas, in this case, the affidavit expressly stated that the buy "had occurred within the previous 72 hours," *id.* Similarly, the government asserts that the Fourth Circuit's decision in *Wilhelm* does not apply, because the informant there was an "unknown, unproven" "concerned citizen," *id.* at 9 (quoting Wilhelm, 80 F.3d at 118, 120), whereas, in this case, the "informant[] [had a] proven track record of providing reliable information," *id*.

Finally, the government takes issue with Hill's characterization of the affidavit's description of the informant's reliability as "conclusory."  To the contrary, the government explains, the affidavit described how the confidential informant "had worked with MPD for more than 10 years, participated in at least 25 controlled purchases of drugs, provided information that led to the issuance of at least 11 search warrants, and never given the police information that was later determined to be unreliable."  Dkt. 35 at 7 (citing Dkt. 35-1 at 4 (Ex. A at 2)).

The government has the better of the argument: the D.C. Superior Court judge who issued the warrant in this case "had a 'substantial basis for . . . conclud[ing]'" that there was a "fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238 (alteration in original) (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).  Hill's most promising argument is that the supporting affidavit stated, without any explanation, that his apartment was a "known drug trafficking location[]."  Hill is correct.  The affidavit does not specify why the officers suspected Hill's apartment, nor does it suggest that the confidential informant identified the apartment as a target location.  *See* Dkt. 35-1 at 4–5 (Ex. A at 2–3).  As a result, the government's invocation of *Warren* is not directly on point, because the officers there were "corroborat[ing] a reliable informant's tip *about drug activity at a residence*," 42 F.3d at 652 (emphasis added).

Hill's problem, however, is that he is unable to identify any authority that would explain why this oversight means that the issuing judge lacked a "substantial basis for . . . conclud[ing]" that there was probable cause, given that the judge was aware that a controlled buy had occurred at the apartment within the previous 72 hours.  Indeed, the only other case from this district to have faced an analogous situation suggests the opposite.  In *Andreen v. Lanier*, the plaintiff challenged the sufficiency of a search-warrant affidavit as part of a Section 1983 action.  573

F. Supp. 2d 1 (D.D.C. 2008).  The affidavit in *Andreen*, like the one here, explained that officers had organized a "single controlled buy" at the target residence, but the affidavit "did not explicitly state that the [confidential informant] had provided the initial 'tip.'"  *Id.* at 4–5. Nevertheless, Judge Huvelle held that the "alleged inadequacies" did not "discredit the issuing judge's probable cause determination."  *Id.* at 5.  She pointed to the "great deference" that magistrates are due under *Gates*, see *id.* (quoting 462 U.S. at 236), and explained that "warrants, and their underlying documents, are not to be read 'hypertechnically, but in a commonsense fashion,'" *id.* (quoting *United States v. Gendron*, 18 F.3d 955, 966 (1st Cir. 1994)).  This reasoning comports with the Supreme Court's directive in *Gates*.  There, the Supreme Court cautioned courts to understand that "affidavits 'are normally drafted by nonlawyers in the midst and haste of a criminal investigation,'" and so "[t]echnical requirements of elaborate specificity once exacted under common law pleading have no proper place in this area."  *Gates*, 432 U.S. at 235.  Rather, as the *Gates* Court continued, "many warrants are—quite properly—issued on the basis of nontechnical, common-sense judgments of laymen applying a standard less demanding than those used in more formal legal proceedings."  *Id.* at 235–36 (citation omitted).

The Court concurs in Judge Huvelle's analysis.  Although in an ideal world the affidavit in this case might have provided information about the source of officers' initial tip concerning the target apartment, that omission is far from fatal.  Put most succinctly, the omission of that detail does not undermine the Superior Court judge's common-sense judgment that the controlled buy, *see Parker*, 789 F. Supp. at 30, by a reliable confidential informant who was surveilled and searched by law enforcement was sufficient to establish a "fair probability that contraband or evidence of a crime w[ould] be found" at Hill's apartment, *Gates*, 462 U.S. at 238–39.

Hill's remaining arguments are equally unavailing.  The Sixth Circuit's decision in *Hython* is inapposite because the defective warrant there did not identify how recently the controlled buy had occurred.  *See* 443 F.3d at 486.  Similarly, the Fourth Circuit's decision in *Wilhelm* is not on point because there was no controlled buy in that case; instead, the magistrate issued a warrant solely based on a tip from a "concerned citizen" that drugs were being sold at the target location.  80 F.3d at 118.  Nor did the police here need to undertake any additional investigation, as Hill claims.  The plaintiff in *Andreen* raised a similar argument, which Judge Huvelle soundly rejected.  *See* 573 F. Supp. 2d at 4 n.3.  Finally, the affidavit's description of the confidential informant's reliability was far from "conclusory," Dkt. 34 at 4.  The affidavit provided considerable detail about the informant, including that he or she had "worked with the [MPD] for over ten years," "participated in at least twenty-five controlled purchases of illegal controlled substance[s]," "provided information to members of law enforcement that have resulted in at least eleven search warrants being obtained," and "never provided information to a member of Law Enforcement that . . . was later determined to be unreliable."  *Id.* at 4 (Ex. A at 2).  This level of detail suffices.  *See, e.g.*, *Turner*, 73 F. Supp. 3d at 124.

Because the issuing judge had a substantial basis for concluding that probable cause existed, the Court will deny Hill's motion with respect to the physical evidence acquired during the search of his apartment.

2.    *Reasonable Reliance*

Even if the Court were to conclude that the issuing judge's probable-cause determination lacked a substantial basis, Hill's claim would still fail because he cannot show that the officers' reliance on the judge's issuance of the warrant was unreasonable.  In order to succeed on a motion to suppress evidence seized pursuant to a subsequently invalidated search warrant, a

11

defendant must show that (1) "the magistrate or judge [who] issued [the] warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for reckless disregard for the truth;" (2) "the issuing magistrate wholly abandoned his judicial role;" (3) the "affidavit [was] 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;'" or (4) the "warrant [was] so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923 (quoting *Brown v. Illinois*, 422 U.S. 590, 610–11 (1975) (Powell, J., concurring)).  The premise of this rule is that "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant" do not "justify the substantial costs of exclusion." *Id.* at 922.

Hill appears to put only the third basis for exclusion at issue.  In his motion, he asserts that the search warrant affidavit was "completely devoid of any probable cause," and so it was "unreasonable for the officers to rely on it."  Dkt. 37 at 5.  The inquiry that Hill invites is an objective one, and it does not involve "inquiries into the subjective beliefs of law enforcement officers who seize evidence pursuant to a subsequently invalidated warrant." *Leon*, 468 U.S. at 922 n.23.  Instead, the Court's task is to decide "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Id.*

Hill does not specify why he believes the warrant here was "so lacking in indicia of probable cause" as to make the officers' reliance "entirely unreasonable." *Id.* at 923.  But, even considering Hill's most promising argument—that the affidavit failed to specify the basis for officers' belief that Hill's apartment was a "known drug trafficking" location—Hill does not meet the high bar for showing that the police officers *unreasonably* relied on a warrant issued by

a Superior Court judge.  Hill does not point the Court to any authority that even hints at the
conclusion that an affidavit premised on a controlled buy made by a reliable confidential
informant, who was searched and surveilled, is "'so lacking in indicia of probable cause as to
render official belief in its existence entirely unreasonable,'" *Leon*, 468 U.S. at 923.  Indeed, the
only case that the parties discuss with a fact pattern similar to this case not only found reasonable
reliance but also held in the first instance that the magistrate had a substantial basis for issuing
the warrant.  *See Andreen*, 573 F. Supp. 2d at 5.  As in *Andreen*, "[t]his warrant application was
not based on 'wholly conclusory statements, which lack the facts and circumstances from which
[the Superior Court judge could] independently determine probable cause.'  To the contrary, it
was quite specific.  Thus, even if a technical inaccuracy rendered the warrant invalid, there
would be no basis for" excluding the evidence seized during the search.  *Id.* at 5 (quoting *United
States v. Laury*, 985 F.2d 1293, 1311 n. 23 (5th Cir. 1993)).  In short, this is not a case where the
officers "ha[d] no reasonable grounds for believing that the warrant was properly issued."  *Leon*,
468 U.S. at 923.

Accordingly, even if the Court had concluded that the warrant was unsupported by
probable cause, Hill's motion would still fail because the officers' reliance on the warrant was
entirely reasonable.

### B.    Hill's Statements to Police

Hill's motion to suppress the statements that he made during his interrogation is on far
firmer ground.  Under *Miranda v. Arizona*, an accused person has a right to stop a "custodial
interrogation" by "indicat[ing] in any manner . . . that he wishes to consult with an attorney."
384 U.S. 436, 444 (1966).  This right may be waived.  But the Court has "indicated that
additional safeguards are necessary when the accused asks for counsel," and so "a valid waiver

13

of that right cannot be established by showing only that [the accused] responded to further

questioning" after making his request. *Edwards v. Arizona,* 451 U.S. 477, 484 (1981).  Rather,

once "an accused . . . ha[s] expressed his desire to deal with the police only through counsel, [he]

is not subject to further interrogation by the authorities until counsel has been made available to

him, unless the accused himself initiates further communication, exchanges, or conversations

with the police." *Id.* at 484–85.  Any statements elicited from a suspect in violation of this rule

are "inadmissible" as part of the government's case. *Id.* at 487; *cf. Harris v. New York*, 401 U.S.

222 (1971) (exception for purposes of impeaching defendant's trial testimony).

To invoke the right to counsel, an accused person must "articulate his desire to have

counsel present sufficiently clearly that a reasonable police officer in the circumstances would

understand the statement to be a request for an attorney." *Davis v. United States*, 512 U.S. 452,

459 (1994).  The focus is on a reasonable expression: the accused person "need not speak with

the discrimination of an Oxford don," *id.* (quotation marks omitted), and "there is no exact

formula or magic words for an accused to invoke his right," *United States v. Lee*, 413 F.3d 622,

625 (7th Cir. 2005).  But an accused person's statement must be "an unambiguous or

unequivocal request for counsel;" otherwise, "the officers have no obligation to stop questioning

him." *Davis*, 512 U.S. at 461–62.  To this end, the Supreme Court has acknowledged that "it

will often be good police practice for the interviewing officers to clarify whether or not [the

suspect] wants an attorney" if he "makes an ambiguous or equivocal statement," although

officers are not required to do so. *Id.* at 461.

Hill contends that he "unequivocally asserted his right to an attorney," Dkt. 34 at 3,

during his interrogation when, in response to the question, "[A]re you willing to answer any

questions without an attorney present?" he replied that he would "rather have an attorney

present," Dkt. 37 at 2.  The government disagrees and claims that Hill's use of the word "rather,"

as well as his "hesitating tone," rendered his invocation "ambiguous," Dkt. 35 at 11, and so the

interviewing officers were justified in continuing the interrogation.  (The government does not

argue that Hill's further statement—"I need to know what I'm locked up for," *id.* at 3—

introduced any ambiguity into his request for counsel.)

  The Court has reviewed the video recording of Hill's interrogation, Dkt. 35-3 (Ex. C); a

transcript of the interrogation, Dkt. 35 at 3–4; and the waiver-of-rights form that Detective

Langenbach filled out while questioning Hill, Dkt. 35-4 (Ex. D).  After reviewing these materials

and considering them in light of the relevant case law, the Court concludes that Hill

unequivocally invoked his right to counsel when he stated that he would "rather have an attorney

present."  When Hill was asked whether he wanted to answer any questions, he responded, "No,

not really no."  Dkt. 35 at 3.  Detective Langenbach then asked: "Are you willing to answer any

questions without an attorney present?" and Hill responded, "I'd rather have an attorney

present."  *Id.*  That constitutes a clear articulation of his desire, at that moment, not to answer

questions without counsel present.  As a result, the detectives' subsequent statements—which

were designed to elicit further responses from Hill—were improper.  The Court will,

accordingly, suppress the remainder of Hill's interview after his invocation of his right not to

answer questions without counsel present.

  In arguing to the contrary, the government points to various state supreme court cases

that have held that contemplative phrases like "I prefer a lawyer," *Delashmit v. State*, 991 So. 2d

1215, 1221 (Miss. 2008), or "I would feel more comfortable [with a lawyer]," *People v. Molano*,

443 P.3d 856, 883 (Cal. 2019), did not constitute unequivocal invocations for the purpose of

*Davis.*  Dkt. 35 at 11–12; *see also Reaves v. State*, 740 S.E.2d 141, 147 (Ga. 2013); *Anderson v.*

*State*, 863 So. 2d 169, 184 (Fla. 2003).  The government also invokes a decision from the Eighth

Circuit, *United States v. Mohr*, which held that the statement "I think I should get a lawyer" was

ambiguous.  772 F.3d 1143, 1146 (8th Cir. 2014).

These precedents address materially different language and are thus inapposite.

Statements like "I would feel more comfortable with a lawyer" or "I think I should get a lawyer"

are better characterized as musings or deliberations than as unequivocal expressions of the right

to counsel.  Courts, moreover, even disagree about the phrase "I think I should talk to a lawyer."

The government cites to the Eighth Circuit's decision in *Mohr*, but the Seventh Circuit has held

otherwise; in *United States v. Lee*, it identified the phrase "I think I should call my lawyer" as an

example of an unequivocal expression of the desire for counsel.  413 F.3d 622, 626 (7th Cir.

2005).

The government comes slightly closer to the mark with the phrase "I'd prefer," in that

"I'd prefer" and "I'd rather" are similar phrases.  Yet, the government's analogy runs into two

problems.  First, the analysis in the "I'd prefer" cases leaves much to be desired.  These decisions

largely rely on one case from the Mississippi Supreme Court, *Delashmit v. State*, 991 So. 2d

1215, without adding any further explanation or analysis.  *See Molano*, 443 P.3d at 883; *Reaves

v. State*, 740 S.E.2d at 147.  And, *Delashmit* itself is thinly reasoned: the full extent of the court's

analysis consists of the following: "'I prefer a lawyer' [i]s only an ambiguous mention of

possibly speaking with an attorney."  991 So. 2d at 1221; *see also Anderson*, 863 So. 2d at 184

(finding ambiguity because the defendant stated, "I just don't … prefer now to wait until there's

an attorney").  These decisions do little to advance the government's position.

The government's larger problem, however, is that several cases have concluded that the

phrase "I'd rather have a lawyer" *is* unambiguous.  In response to the government's reliance on

cases discussing the phrase "I prefer a lawyer," Hill points the Court to eight decisions from federal district courts and state courts that have held that the phrase "I'd rather have a lawyer" constitutes an unambiguous assertion of the right to counsel. *See* Dkt. 37 at 3 (citing *United States v. Espinal-Cardona*, 635 F. Supp. 330, 333 (D.N.J. 1986); *United States v. Ford*, No. 506CR14, 2006 WL 2884534, at *2 (S.D. Miss. Oct. 10, 2006); *United States v. Jackson*, No. 14-CR-135, 2015 WL 13344108, at *3 (D.N.D. Aug. 5, 2015); *United States v. Eiland*, No. 18-CR-3154, 2019 WL 2724077, at *4 (D. Neb. July 1, 2019); *McDaniel v. Commonwealth*, 506 S.E.2d 21, 23 (Va. Ct. App. 1998); *People v. Thomas*, 27 N.Y.S.3d 815, 821 (Co. Ct. 2016); *State v. Munson*, 594 N.W.2d 128, 139 (Minn. 1999); *Booker v. State*, 851 P.2d 544, 547 (Okla. Crim. App. 1993)).  The circumstances the Minnesota Supreme Court faced in *State v. Munson* are similar to those presented here.  In *Munson*, officers read the suspect his *Miranda* warnings and then said, "before we ask you any questions, do you want to tell us what happened tonight?" Munson responded: "I think I'd rather talk to a lawyer."  594 N.W.2d at 133.  The Minnesota Supreme Court concluded that this statement, "coming as it did almost immediately after Munson was read his *Miranda* rights, was sufficiently clear that a reasonable police officer under the same circumstances would have understood the statement to be a request for an attorney." *Id.* at 139.  Here, as in *Munson*, Hill's statement shortly followed his *Miranda* warnings, as well as his statement "no, not really, no," when asked if he wanted "to answer any questions." Moreover, Hill's statement, unlike Munson's, omitted the qualifier "I think."

Although most cases have found the phrase "I'd rather" to be unequivocal, not every court has agreed.  Notably, in *United States v. Jackson*, No. 20-cr-76, 2020 WL 6537217 (N.D. Ind. 2020), the district court concluded that the statement—"I'd rather have a lawyer.  You guys are taking me to jail.  What more is there I can do to help myself?"—did not unambiguously

invoke the defendant's right to counsel.  *Id.* at *2.  The court reasoned that "ordinary reasonable

persons or officers would view" the defendant's use of the words "I'd rather" as "objectively . . .

expressing a conditional preference only" and "th[at] condition . . . was whether there was

anything more he could do to help himself."  *Id.*  Reading Jackson's statement in context, the

district court construed his statement merely to mean that he "*might* rather have counsel, *if* there

was no condition under which he could help himself."  *Id.* (emphases added and omitted).  Read

in this manner, the statement "wasn't enough to require" the officer to disengage.  *Id.*

      At least as applied to the context of this case, the Court is unpersuaded and declines to

treat Hill's request as "a conditional preference."  The phrase "I would rather," can sometimes

express "a conditional preference," but it often expresses an absolute preference.  Detective

Langenbach's question, and Hill's response, contemplate only two options—answering questions

with or without counsel present—and Hill unequivocally chose one of those options: he

indicated that he would "rather" have counsel than not.  The Supreme Court has admonished that

suspects need not "speak with the discrimination of an Oxford don," *Davis*, 512 U.S. at 459, and,

at least as far as common parlance is concerned, responding to an offer with the words, "I'd

rather not," is widely understood as a polite (but clear) way to decline it.

      In the end, what matters under *Davis* and *Edwards* is whether the suspect's "desire" for

counsel is expressed clearly enough that a reasonable officer would understand what the suspect

wants in that situation, *i.e.*, a lawyer.  *Davis*, 512 U.S. at 459.  When understood in these terms,

Hill must prevail.  Shortly after Hill was read his *Miranda* rights, he was asked whether he

wanted to answer any questions, to which he responded, "No, not really, no."  Dkt. 35 at 3.

Immediately after that, he was asked whether he wanted to answer questions without a lawyer

present, to which he shook his head, muttered "nah," and then said, "I would rather have a

lawyer present." *Id.*; Dkt. 35-3 (Ex. C at 1:10–1:20).  This case, accordingly, differs from other

situations in which the Supreme Court has found that uncertainty existed.  In *Davis*, for example,

the Court concluded that the phrase "maybe I should talk to a lawyer" was equivocal, but the

circumstances here are different from *Davis*.  A statement that one should "maybe" talk to a

lawyer is a musing about a possibility; a reasonable officer would think that the suspect is still

deliberating as to his final answer.  Here, in contrast, Hill did not use the words "think" or

"maybe" or "should."

The government offers two further arguments.  First, even if Hill's words themselves

were clear, it claims that his words alone are not dispositive, because Hill replied in "a hesitating

tone" that indicated that he was not certain.  Dkt. 35 at 11.  The government does not cite to any

authority that explains whether and when a suspect's tone may render ambiguous otherwise

unambiguous words, but it is not difficult to imagine situations in which a suspect's tone or

mannerism might affect whether a "reasonable police officer *in the circumstances*" would

"understand [a] statement to be a request for an attorney."  *Davis*, 512 U.S. at 459 (emphasis

added).  In any event, the Court need not determine the extent to which factors like tone and

mannerism matter for purposes of *Davis* because the video recording of Hill's interrogation

clearly demonstrates that his request was unequivocal.  When asked whether he was willing to

answer questions without an attorney present, Hill paused momentarily, shook his head, muttered

"nah," and then said "I'd rather have an attorney present.  I need to know what I'm locked up

for."  *See* Dkt. 35-3 (Ex. C at 1:10–1:20).  Nothing in Hill's tone or body language at that

moment indicated that, contrary to the plain meaning of his words, he wished to answer

questions *without* a lawyer.  If anything, his tone reflected an understanding of the grave

circumstances that he faced.

The government's second argument seeks to cast doubt on the clarity of Hill's invocation of counsel by pointing to his later statements during the interrogation, including his later agreement to answer questions without counsel present.  *See* Dkt. 35 at 12–13.  According to the government, Hill's later willingness to answer questions shows that he was not certain when he initially invoked his right to counsel.  This argument, however, admits of a fatal flaw: the Supreme Court has squarely held that courts may not look to a suspect's post-invocation statements to cast doubt on an otherwise unambiguous request for counsel.  In *Smith v. Illinois*, the Supreme Court held that "[u]sing an accused's subsequent responses to cast doubt on the adequacy of the initial request itself is . . . intolerable."  469 U.S. 91, 98–99 (1984).  The Court explained that "[n]o authority, and no logic, permits the interrogator to proceed . . . on his own terms and as if the defendant had requested nothing, in the hope that the defendant might be induced to say something casting retrospective doubt on his initial statement that he wished to speak through an attorney or not at all."  *Id.* (quotation marks omitted).  In short, any evidence of Hill's later willingness to answer questions cannot cast doubt, retroactively, on a previous invocation that was unambiguous.  Once a court encounters an unequivocal invocation, it may look no further.[*]  Indeed, the detectives' tactics in this case provide a classic example of the precise conduct that concerned the *Smith* Court.  After Hill invoked his right to counsel, the detectives sought to convince him to change his mind with statements and questions that implied that Hill was making a mistake.  *See* Dkt. 35 at 3.  *Smith* prohibits law enforcement officers from proceeding in this manner.

---

[*] This rule admits of an exception not applicable here.  Under *Edwards*, a suspect's post-invocation statements are admissible if "the accused himself initiates further communication, exchanges, or conversations with police."  451 U.S. at 485.  Understandably, the government has not argued that Hill reinitiated contact with the detectives, *see* Nov. 29, 2021, Hrg. Tr. (Rough at 40–41), since that argument would almost certainly fail.

The government argues that the officers were trying to clarify Hill's invocation, not to pressure him into changing his mind. It points to the passage in *Davis* where the Supreme Court notes that "it will often be good police practice for the interviewing officers to clarify whether or not [a suspect] actually wants an attorney." 512 U.S. at 461. But this argument misses the mark. As *Davis* itself clarifies, officers may clarify an invocation only if a suspect "makes an ambiguous or equivocal statement." *Id.* As the Court has already explained, this is not such a case.

As a final observation, the Court notes that, although *Davis*'s "reasonable officer" test is an objective inquiry, the detectives' actions in this case support the Court's conclusion that Hill's invocation of counsel was objectively unambiguous. At the evidentiary hearing on this motion, the Court heard testimony from Detective Langenbach, one of the two detectives who initially questioned Hill at the police station. Detective Langenbach read Hill his rights and filled out a waiver-of-rights form as he asked Hill whether he understood and wished to invoke those rights. *See* Dkt. 35-4 at 2 (Ex. D) (waiver form). That waiver-of-rights form contained four questions:

1.  Have you read or had read to you the warning as to your rights?

2.  Do you understand these rights?

3.  Do you wish to answer any questions?

4.  Are you willing to answer any questions without having an attorney present?

*Id.* (Ex. D). Next to each question is a box labeled "Yes" and a box labeled "No." *Id.* (Ex. D). On Hill's waiver of rights form, which the government attached as Exhibit D to its opposition brief, the "Yes" box is checked for Questions 1 and 2. *Id.* Significantly, however, both the "Yes" *and* "No" boxes are checked next to Questions 3 and 4. During cross examination, Detective Langenbach acknowledged that he initially checked "No" next to Questions 3 and 4 because he understood Hill's responses—"no, not really, no" and "I'd rather have a lawyer

21

present"—to mean that "he did not want to answer any questions" and "he did not wish to answer questions without an attorney present."  Nov. 29, 2021, Hrg. Tr. (Rough at 18–19).  It was only *after* the other detective in the room, Detective Rothman, continued to talk to Hill, and thereby prompted Hill to reconsider his invocation, that Detective Langenbach checked the "Yes" boxes next to those questions.  *See id.* at 19.  Detective Langenbach's testimony and actions thus demonstrate that he understood Hill's initial invocation—the only statement that matters under *Smith*—to have triggered Hill's right to counsel.

Accordingly, the Court will grant Hill's motion to suppress his post-invocation statements to police.

## CONCLUSION

For the foregoing reasons, Defendant's motion to suppress, Dkt. 34, is hereby **GRANTED** in part and **DENIED** in part.  The motion is **DENIED** with respect to the physical evidence seized during the September 28, 2021, search of 3513 Ames Street, N.E., Apt. 102, but the motion is **GRANTED** with respect to Hill's post-invocation statements during his interview with detectives.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  December 14, 2021

22